**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
COVINGTON**

**CRIMINAL ACTION NO. 04-70-DLB**

**UNITED STATES OF AMERICA**                                                    **PLAINTIFF**

vs.                                   **OPINION & ORDER**

**ROBERT R. CALDWELL**                                                  **DEFENDANT**

\* \* \* \* \* \* \* \* \* \* \* \*

This matter is before the Court on Defendant's Motion to Suppress. (Doc. #19) The United States filed a written response to this motion (Doc. #20), and an evidentiary hearing was held on June 3, 2005. The United States filed a post-hearing brief. (Doc. #34) Defendant's counsel was granted leave to withdraw prior to filing a post-hearing brief, and new counsel was appointed. The Court then granted Defendant's request for a further evidentiary hearing on his motion to suppress. This hearing was held on September 26, 2005. Assistant United States Attorney Robert K. McBride appeared on behalf of Plaintiff; David F. Fessler, Esq. appeared on behalf of Defendant, who was also present for this hearing. The proceedings were recorded by Official Court Reporter Amy Blosser. Defendant has now filed his post-hearing brief, and the United States has waived any further post-hearing filings. Therefore, Defendant's suppression motion (Doc. #29) is now ripe for review.

*I.*     ***INTRODUCTION***

Defendant was arrested on June 9, 2004, on an outstanding warrant from Ohio. Agents of the Northern Kentucky Drug Strike Force (NKDSF) testified that marijuana was

found in Defendant's pocket during a search of Defendant's person incident to that arrest. At the time of arrest, Defendant was registered as a guest at the Extended Stay Hotel in Covington, Kentucky. Agents conducted a search of Defendant's hotel room, finding marijuana, crack cocaine, and firearms. Defendant was indicted on five counts – possession with intent to distribute crack cocaine (Count 1), possession with intent to distribute marijuana (Count 2), possession of firearms in furtherance of drug trafficking crimes (Count 3), and two forfeiture counts (Counts 4 and 5).

## II.     ISSUE

Defendant seeks to suppress the drugs and firearms seized from his hotel room as having been obtained in violation of his Fourth and Fourteenth Amendment rights. Specifically, he contends authorities lacked valid third-party consent to conduct a warrantless search of the room.

## III.    FACTS

As noted, two hearings were conducted on Defendant's motion. The United States presented testimony from NKDSF Agents Andy Muse and John Mulligan at the initial hearing. Defendant had subpoenaed to testify at this hearing his companion at the time of this incident, Kelly Meyer. At the hearing her counsel invoked her Fifth Amendment privilege against self-incrimination in light of pending state charges relating to her use of aliases, as will be discussed below. During the further evidentiary hearing, Defendant testified in his own behalf and was permitted to conduct further cross-examination of Agent Muse. The relevant evidence presented by both sides can be summarized as follows.

It is undisputed that on June 9, 2004, Defendant Caldwell and a female companion, whose legal identity is now known to be Kelly Meyer, checked into the Extended Stay Hotel in Covington, Kentucky. The Hotel's guest registry form (Pltf. Ex. 1) reflects Robert Caldwell signed as "Guest 1." Ms. Meyer, using the alias "Pahree Caldwell", signed as "Guest 2." The form also shows the printed name "CALDWELL PAHREE A." on the line marked "Additional Guest." They were assigned room 412.

It is also undisputed that room 412 was paid for in cash. Defendant testified he provided the funds to pay for the room, and that Ms. Meyer had no money. Agent Muse testified the hotel's management informed him that Robert Caldwell paid for the room. Muse said they also told him the woman, then known as Pahree Caldwell, was going to register the room in her name but did not have identification. Defendant had an Ohio State identification card. The hotel's policy required presentation of identification when paying in cash.

Agent Muse testified he first learned of potential criminal activity when, shortly after 2:00 p.m., he received a call from the hotel management reporting the odor of marijuana coming from room 412. The hotel faxed the registration form to him which identified the room's occupants. Agent Muse proceeded to run these names through the NCIC police database whereupon he learned that Robert Caldwell had an active Ohio warrant. Muse found no database information under the name "Pahree Caldwell."

Due to the outstanding warrant, Agent Muse assembled a team of agents and proceeded to the hotel. His report reflects they arrived at the Extended Stay approximately three hours later. Upon arrival, Muse spoke with the desk clerk on duty. She, along with the hotel manager, provided him with a general description of the female who had checked

in room 412 earlier that afternoon. He recalled their description as being that of a short white female with black reddish hair. They described Robert Caldwell as a black male, and Muse had in hand a photocopy of Robert Caldwell's identification made by the hotel when he had checked.

Agents Muse and Mulligan set up surveillance in the room across the hall from room 412. Approximately 50 minutes later, they observed a couple exit room 412. Muse testified he identified the man as Robert Caldwell based upon the physical description in his possession. Defendant does not dispute he was the person departing room 412 at that time. Muse testified he took for granted that the female accompanying him was the woman who had checked in with him as Pahree Caldwell, the only name Agent Muse had at that time for Ms. Meyer.

As the pair exited the hotel, Agents Muse and Mulligan also proceeded downstairs. They alerted the other posted officers of the couple's impending exit. Defendant and Ms. Meyers exited the building and entered a sport utility vehicle registered to Robert Caldwell and parked in the hotel's lot. Ms. Meyer was driving the vehicle; Defendant was seated in the front passenger's seat. Ms. Meyer started to exit the parking lot when the vehicle's path was interrupted by police cruisers.

At this point in the sequence of events, the testimony varies dramatically. Agents Muse and Mulligan testified the other officers first approached the vehicle, then he and Agent Mulligan arrived upon the scene. Agent Muse approached the passenger side of the vehicle where Defendant had been seated. Several officers then removed him from the vehicle. Muse spoke with Defendant, asking that he identify himself. Defendant responded with his legal name. He then asked Defendant whether he was aware that he had an

4

outstanding warrant from Ohio. Defendant was placed under arrest pursuant to this warrant.[1]

Agent Muse proceeded to pat down Defendant, and discovered Defendant had several baggies of marijuana on his person. Agent Muse initially testified that 14 bags were found in Defendant's right rear pocket. On cross-examination, Muse acknowledged that in the state court preliminary hearing he testified that 13 bags of marijuana were found in Defendant's left rear pocket. Muse also acknowledged that the NKDSF evidence log prepared at the time (Def. Ex. 2) documents 13 small bags of marijuana as having been taken from Defendant's left front pocket. The Court finds this discrepancy insignificant.

Following the pat down, the officers placed Defendant on the curb. Muse explained to Caldwell that they were responding to a drug complaint on his room, then asked him "if he had "a problem if we go up and check his room; and his comment to me was that, 'Ask her [referring to Kelly Meyer]. It's her room.'" (Doc. #33, p.12)

According to Agent Mulligan, while Agent Muse was dealing with Defendant, he had approached the driver's side of the car, where several other officers had removed Ms. Meyer from the vehicle. At that time, to Agent Mulligan's knowledge this female was Pahree Caldwell, the woman who had registered with Defendant. Mulligan testified she gave the last name of Caldwell, but he was unable to recall what first name she gave them. She had no identification with her. When asked whether she had personal property in the hotel room; she answered yes. Meanwhile, by this time Agent Muse had finished speaking

---

[1] Defendant, after being appointed new counsel, initially indicated he was also requesting a further evidentiary hearing on his suppression motion because he intended to challenge probable cause for his arrest. But during the second hearing, Defendant acknowledged that the outstanding arrest warrant from Ohio provided probable cause for his June 9, 2004, arrest.

5

with Defendant and was approaching Ms. Meyer. Agent Muse testified he walked up to her and asked whether the room belonged to her, she responded yes. He asked her whether she had anything illegal in the room; she answered no. He then asked, "Do you mind if we look?" and testified she answered no. (Doc. #33, p.12)

Agent Muse thereafter sought to obtain a consent form for Ms. Meyer to sign. Agent Mulligan testified that while still in the parking lot, Muse asked for a consent form, and that he (Agent Mulligan) instructed another agent to get one for Muse while he proceeded upstairs to secure the hotel room. While still in the parking lot with Ms. Meyer, Agent Muse asked her whether she was Pahree Caldwell. She responded by stating her name was Dawn Scherer. Muse then asked her whether she had signed in at the hotel as Pahree Caldwell. She responded yes, but stressed to Agent Muse that her name was actually Dawn Scherer. Agent Muse testified he proceeded to read the consent form to Ms. Meyer and also explained to her that she did not have to consent. According to Muse, she said there was nothing in the room and then proceeded to sign the form. (Pltf. Ex. 3) She signed the form with the name Dawn Scherer. The first line of the form contains a blank within which to print the consenting party's name. In this space, Agent Muse marked "Dawn C. Scherer AKA Pahree A. Caldwell." The form, signed by Ms. Meyer under the alias Dawn Scherer, is marked as being signed at 6:33 p.m. Agent Muse testified that Robert Caldwell was present in the parking lot during his exchange with Ms. Meyer, including her signing of the consent form.

At the further evidentiary hearing, Defendant had quite a different version of these events. He testified that he and Ms. Meyer were stopped as they were leaving the parking lot, that he was then pulled out of the vehicle by several officers, Agent Muse not among

6

them, slammed to the ground and handcuffed.  He said the officers asked him his name, whether he had identification, and whether he was aware there was an outstanding Ohio warrant for him.  He testified that during this exchange, he saw Ms. Meyer kneeling on the ground on the other side of the vehicle, with her hands behind her head.

As for the search of his person incident to arrest, Defendant testified that besides his state identification card presented to the officers, he had $182 in his pocket, a cell phone, his hotel swipe card, and a debit card.  Defendant is not challenging in these suppression proceedings the marijuana allegedly found on his person.  However, at the evidentiary hearing he denied having any illegal substances on him at the time of arrest.

Defendant testified the officers with him then asked if he had anything illegal inside his hotel room; he responded no.  He said the officers asked him if they could search the room, but he made it clear to them that if they did not have a search warrant, they could not search the room.  Caldwell maintains that Kelly Meyer did not have authority to consent to a search of the room.  He stated the hotel issued only one swipe card, which was issued to him, and that the card was in his pocket when he was arrested.  Defendant testified he intended to stay in the room that night, though his personal belongings were still in the car at that point.

Caldwell testified that after refusing to consent to the room search, he was placed in a Covington police car and taken to the Kenton County Jail.  He said Agent Muse was not present during these events in the parking lot, arriving on the scene only as the officers were placing him in the cruiser to transport him to jail.  Defendant said he was unable to hear any of the conversation between Ms. Meyer and the officers.  And he denies being present while Ms. Meyer was being questioned about search of the room, or allegedly

consenting to a search, or signing a consent form. Defendant introduced at hearing the Kenton County Jail form noting his intake as 6:34 p.m. (Def. Ex. 4).

The agents proceeded to search room 412 per Meyer's consent. It is undisputed that Defendant Caldwell was not present during this search. Agent Muse was unable to recall exactly how the officers gained access to the room – whether by hotel management, by swipe card furnished by Ms. Meyer, or by key card on Defendant's person at arrest. Agent Mulligan testified that Agent Muse and Ms. Meyer appeared outside the room, Agent Muse indicated she had signed the consent, and then they entered the room. Both agents testified Ms. Meyer remained in the room throughout the search, which took approximately one hour. Agent Mulligan testified he asked Ms. Meyer which items in the room were hers, and she pointed to a small suitcase. The case contained typical clothing and personal items belonging to a female. Agent Muse testified they found burnt marijuana in the room. The officers also found five bags of marijuana, a quantity of crack cocaine, and two handguns in a white paper bag. (Pltf. Ex. 6) A CD case in the room contained two plastic bags of plant material, two boxes of ammunition, and a digital scale. (Def. Ex. 2)

According to agents Muse and Mulligan, Ms. Meyer was calm and cooperative throughout the search. Agent Mulligan testified he was not aware that Ms. Meyer had actually signed the consent form as Dawn Scherer. He said he first heard the name Dawn Scherer when he was already in the hotel room, and asked another agent whether this girl was now saying her name was Dawn Scherer, rather than Caldwell. Agent Muse testified that Ms. Meyer eventually volunteered that her legal name was Kelly Meyer. In the federal hearing, he said it took about twenty minutes for her to offer her true identity, though in the state court preliminary hearing he testified it was a couple of hours before she provided her

name. After he questioned "Dawn Scherer" for her Social Security number and other identifying information so that he could run a check, she confessed her name was actually Kelly Meyer, and that she withheld her true identity because she believed there to be an Ohio warrant for her arrest.

## IV.   ANALYSIS

### A.   Standard of Review

Fourth Amendment jurisprudence recognizes that overnight guests in another's home or in a motel possess a reasonable expectation of privacy in such temporary shelters. *Minnesota v. Carter,* 525 U.S. 83, 89-90 (1998); *Stoner v. California,* 376 U.S. 483, 489-90 (1964)(hotel clerk cannot consent to search of room, as the constitutional right is not his to waive). "[A] guest in a hotel room is entitled to constitutional protection against unreasonable searches and seizures. . . . [which] protection would disappear if it were left to depend upon the unfettered discretion of an employee of the hotel." *Stoner,* 376 U.S. at 490.

It is also widely recognized "that a search conducted without a warrant issued upon probable cause is 'per se unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte,* 412 U.S. 218, 219 (1973)(quoting *Katz v. United States,* 389 U.S. 347, 357 (1967)). A search conducted pursuant to valid consent is one such specifically established and well-delineated exception. *Id.*

Robert Caldwell and Kelly Meyer both occupied room 412 of the Extended Stay. Agent Muse testified that it was Kelly Meyer who consented to a search of the room. Consent from a joint or co-occupant is valid in two general circumstances. One is where

permission is obtained from a "third party who possessed common authority or other significant relationship to the premises or effects sought to be inspected." *United States v. Matlock,* 415 U.S. 164, 171 (1974). The other is where the third party does not, in fact, have common authority over the premises, but reasonably appeared to have common authority over the premises given the surrounding circumstances. *Illinois v. Rodriguez,* 497 U.S. 177, 188 (1990). The government bears the burden of establishing the validity of consent obtained from a third party. *Matlock,* 415 U.S. at 167.

### B.     Actual Authority to Consent

As noted, one exception to the warrant requirement is where consent is given by one with actual authority. Under *Matlock,* common authority to consent to search rests upon mutual use of the property by persons generally having joint access or control for most purposes. *Matlock,* 415 U.S. at 170 & n.7. Any of the co-occupants has the right to permit an inspection in his own right and the others assume the risk that one of their number might permit the common area to be searched. *Id.; United States v. Moore,* 917 F.2d 215, 223 (6th Cir. 1990).

The Sixth Circuit has not addressed the specific question of whether co-occupants of a hotel room possess common authority over the room. However, there are circuit cases involving common authority questions in circumstances other than hotel rooms. For example, in *United States v. Hall,* a homeowner was found to have actual common authority to consent to a search of a boarder's room. 979 F.2d 77, 79 (6th Cir. 1992). This was because the individual consenting owned the house and all of the room's furnishings, had personal items stored in an adjacent room accessible only by passing through the boarder's unlocked room, and had access to the boarder's room at all times. *Id.* In *United*

*States v. Moore,* a live-in girlfriend was found to have actual common authority to consent to search the bedroom she shared with the defendant, as "it is well-established that a third party can consent to a search of jointly occupied property, as long as the third party has 'common authority' over the premises." 917 F.2d 215, 223 (6th Cir. 1990). And in *United States v. Clutter,* the court upheld a search of a bedroom shared by defendants, which search was conducted after the officers were provided access to the room by the children of one of the room's occupants. 914 F.2d 775, 778 (6th Cir. 1990). Using *Matlock's* guiding standards for common authority, the court concluded that under the circumstances, the children had common authority over the room because they routinely had exclusive control of the house, the odor of marijuana was obvious upon entry to the home, and large quantities of marijuana were openly visible in the bedroom. The court noted that while a greater expectation of privacy can be associated with a bedroom than with common areas of a home, these children had a "degree of access and control over the house that afforded them the right to permit inspection of any room in the house, and Defendants assumed that risk." *Id.*

These circuit court cases evidence that determination of common authority is not the subject of a bright-line rule, but rather under *Matlock* is an inquiry driven by the particular circumstances of each case. The Tenth Circuit, in *United States v. Kimoana,* addressed consent by co-occupants of a hotel room. 383 F.3d 1215 (10th Cir. 2004). The defendant was the registered occupant of a hotel room that he shared with other members of his gang. One of these other occupants permitted a search that resulted in charges against the defendant. Applying the *Matlock* standard, the court found that the consenter, though not signed on the guest registry, had joint access and control over the room because he

11

stayed there overnight, left his possessions there, and had a key. *Id.* at 1222. Given these factual circumstances, the court held the occupants had actual common authority to consent to the room's search. *Id.*

In this case, Kelly Meyer, using the name "Pahree Caldwell," signed into the room as an additional guest. The registry provided to NKDSF agents listed Defendant as "Guest 1" and Pahree Caldwell as "Guest 2," designations suggestive of an equal status between them as guests. She had placed a suitcase with personal belongings in the room; agents were aware she had an personal suitcase in the room prior to their entry to search it. Meyer and Defendant had checked in together, spent approximately the same amount of time there, and were observed exiting room 412 together. Defendant does not deny this.

Defendant notes that he paid for the room. This alone is not determinative of whether Meyer had common authority. The hotel clerk indicated to Muse that the female occupant first tried to register the room, but had no identification as required for cash payment. Accepting as true that he was the one who paid for the room is not coextensive to finding that he was the only person who could provide consent to search the room.

Defendant emphasizes that he did not consent to a search of the room. This fact is not disputed. What is disputed are the circumstances surrounding his lack of consent. According to Agent Muse, he did not consent because he indicated the room was not his but Ms. Meyer's, and told him to ask her.[2] If the Court were to accept this testimony as credible, it is strong evidence of actual authority of Ms. Meyer. At hearing, Defendant expressly denied making any such statement. Instead, he claims no consent was given

---

[2] Based on this statement, an argument could be made that Defendant lacks standing to contest the search and/or abandoned any expectation of privacy he may have had. However, the Court chooses to not address the standing/abandonment issue on the merits.

because the agents did not have a search warrant.  However, Agent Muse's testimony is more credible on this point.  In the course of his testimony, Defendant squarely denied having any illegal drugs on his person at the time of his arrest in the hotel parking lot.  This testimony is not believable and detracts from Defendant's overall credibility.  The existence of the marijuana was noted on the evidence sheet.  There were multiple officers on the scene at arrest, when the marijuana was found on his person.  These officers would all have to be in collusion to frame Defendants for drugs.  Marijuana and packaging baggies were found in the room, suggestive of distribution of marijuana and consistent with the resale size packets found in Defendant's pocket.  While Defendant successfully pointed to inconsistencies in Agent Muse's prior testimony as to the number of marijuana bags and pocket where it was found, these minor inconsistencies do not taint or deter from the overall credibility of the Muse's testimony.  When compared to Defendant's express denial that any marijuana was found on his person, the minor inaccuracies in Muse's testimony pale in comparison.  Nor do such inconsistencies outweigh the serious and material differences between Defendant's claim that no drugs were on his person and the other evidence corroborating this fact.

      Even were the Court to accept as credible Defendant's testimony that he refused a search of the room absent a warrant, this statement does not mean Ms. Meyer lacked authority to consent to a search.  Defendant argues that, contrary to Agent Muse's testimony, he was not present when Meyer signed the consent form.  This is evidenced, he claims, by the fact that the consent form notes it was signed at 6:33 p.m., while the jail form notes he was at the Kenton County Jail at 6:34 p.m.  However, whether Defendant was present when Ms. Meyer signed the consent form simply is not relevant to the common

authority analysis.  "[T]he consent of one who possesses common authority over premises or effects is valid as against the *absent, nonconsenting* person with whom that authority is shared." *Matlock,* 415 U.S. at 170 (emphasis added).  The relevancy of this point, if any, is as to the credibility of the agents.  Again, any inconsistency in this regard is minor at best, given it was drug strike force agents noting the time on the consent form, and it was county jail personnel noting the time on the other form.  The county jail is in close proximity[3] to the hotel parking lot.  The time was being documented based on two different clocks.  And, most importantly, Defendant's presence was not required for consent from Ms. Meyer if she had common authority.

Moreover, nor does the fact that Ms. Meyer signed in under an alias suggest she was without actual authority.  The proper inquiry under *Matlock* is whether the person giving consent has joint access or control of the area to be searched.  A court applying this standard examines the connection between the individual giving consent and the premises being searched.  The name used by the individual is of no consequence except to the extent the use of an alias has some bearing on that connection.  Agent Mulligan testified Ms. Meyer identified herself as Caldwell, the same name as that on the hotel's registration. Agent Muse testified that although Ms. Meyer told him her name was actually Dawn Scherer, she also acknowledged that she was the person who checked into the room with Defendant and that she had done so under the name Pahree Caldwell.  Ms. Meyer was the same person Agents Mulligan and Muse observed exiting the room.  Defendant does not deny that Ms. Meyer was in fact the companion who checked into the room with him and

---

[3]Although no evidence was received on this pont, the Court takes judicial notice that the distance between the hotel and the jail is less than one mile.  *See* www.mapquest.com.

14

that she was the person with him at the time he exited the hotel that afternoon, despite arguments that officers had not continuously monitored the comings and goings of the room. A good deal of time and effort was devoted at hearing to the various identities used by Kelly Meyer. But because officials, before searching the room, proceeded to verify the connection between the female standing before them voluntarily giving consent and the hotel room rented by the Extended Stay to two guests identified as Robert and Pahree Caldwell, the use of two other names by Kelly Meyer does not break the connection between this female and her joint access to or control of room 412.

Defendant's position that his refusal to voluntarily consent to a search invalidates any such consent given by Ms. Meyer is true only if Defendant had *exclusive* access and control to the hotel room. This is not evidenced by the proof of record. Though Defendant argues that he possessed the only swipe key card issued for the room, no such card is noted as having been on his person at the time of arrest. He did not in his testimony deny that Kelly Meyer co-occupied the room. In addition, were the Court to accept as true that Defendant had the only card, there is no proof that Defendant told the agents that he had the only means of gaining access to the room and that Kelly Meyer did not possess control or means of access to the room. His testimony was that he made it clear to agents they did not have *his* consent to a search unless they had a warrant, not that he was the only person who could provide consent because only he had access to and control over the room.

Under *Matlock* and Sixth Circuit precedent, the government need only establish that Meyer had joint access to or control of room 412 in order to have authority to consent to a search of the premises. *Matlock,* 415 U.S. at 164 n.7. Ms. Meyer's status is similar to

the live-in girlfriend in *Moore* who the court found could consent to a search of the bedroom she shared with the defendant. 917 F.2d at 223. And like *Kimoana,* Meyer was a co-occupant of the room, not merely a brief visitor. Although neither Meyer nor Defendant had not yet stayed overnight, her personal belongings and companion travel with Defendant support the conclusion that she intended to stay at the hotel. And, unlike the consenting party in *Kimoana,* Meyer had also signed a guest registration form, albeit using an alias. Finally, Defendant confirmed her co-occupant status and control over the room by telling agents it was her room and directing them to ask her for permission to search. For these reasons, the Court finds that Kelly Meyer had actual authority to consent to the search and, therefore, that the warrantless search of room 412 did not violate Defendant's Fourth Amendment rights.

### C.    **Apparent Authority to Consent**

In the alternative, to the extent there is arguably any issue that Ms. Meyer had actual common authority to consent, she nevertheless had apparent authority to consent. In *Illinois v. Rodriguez,* 497 U.S. 177 (1990), the Supreme Court clarified that authority to consent to search can be apparent, even though not actual, if the circumstances are such that an official has a reasonable basis to believe one has joint access and control. Under *Rodriguez,* the test for whether a party giving consent has apparent authority to consent to a search is an objective one. Namely, "would the facts available to the officer at the moment . . . warrant a man of reasonable caution in the belief that the consenting party had authority over the premises?" *Rodriguez,* 497 U.S. at 188 (internal quotations omitted).

In *United States v. Jenkins,* the Sixth Circuit identified three general situations where the need arises to determine whether a consenter has apparent authority to permit a

16

search. *Jenkins* involved apparent authority to consent to a search of a container (a trailer) by the tractor driver, who was not the owner. The court explained that first, there is a class of situations in which an officer is never justified in believing that a party has authority to permit a search. For example, an officer may never ask a mailman delivering mail to a house for permission to search it, where it is obvious the person does not have authority to permit a search. *United States v. Jenkins,* 92 F.3d 430, 437 (6th Cir. 1996). The second class of possibilities include cases where the consenter would normally not have authority to permit a search, but an officer could be justified in conducting one if the consenter provides additional information indicating common authority. For example, even though a landlord cannot normally give consent to search property used by a tenant, if the landlord states that he stores property or occasionally lives with the tenant, then a reasonable officer may be justified in assuming that the consenter has common authority. *Id.* Finally, there are situations where an officer would typically assume that a person actually has common authority over property, unless further information is provided in the particular context such "that no reasonable officer would maintain the default assumption." *Id.*

It was reasonable based on the facts in this case for Agent Muse to assume that Kelly Meyer had common authority to consent to the search of room 412, the third scenario discussed in *Jenkins.* This conclusion is supported by several facts. First, she signed the register. Second, she occupied the room with Defendant until they exited. Third, she intended to continue to occupy the room as evidenced by her suitcase. Fourth, agents confirmed she was the same female who had registered for the room. Fifth, Defendant said it was her room. Sixth, Ms. Meyer confirmed to Agent Muse that it was her room. And lastly, her control over the room was evidenced by Defendant's comment that agents

17

should ask her for permission to search. She responded to their request for permission as though she, in fact, had control over the room. These circumstances rendered it reasonable for officials, at the time, to believe that Meyer either had exclusive control over the room or at least co-occupant common authority status. Officials can assume that common authority exists unless the facts surrounding the consent give cause to question the validity of that consent. As discussed above, Meyer's use of an alias did not give agents pause, once they confirmed the connection between Meyer and the room.

Of all of the evidence presented to and considered by the court, the only item which perhaps may have given the agents pause as to whether Meyer had actual authority is if she lacked a key card to the room. The testimony on this point is sorted. Defendant claims he had the only card. The presence or absence of a card is not noted on the evidence log or any other document. Nor did the agents recall exactly how they gained access to the room. In *Kimoana* one of the factors noted by the court in concluding the co-occupant had actual authority was that he had a key to the room. *Rodriguez* requires a court to consider all information available to officers at the time. 497 U.S. at 188. Whether Meyer in fact possessed a key card can neither be confirmed nor denied based on the proof submitted. To the extent this lack of evidence confirming Meyer's possession of a room key casts any shadow on her actual authority, the other circumstances presented to Agent Muse, when viewed as a whole, were sufficient for him to reasonably believe that Meyer had control over and authority to access the hotel room.

## V. CONCLUSION

For the reasons stated herein, **IT IS ORDERED** that:

(1) Defendant's Motion to Suppress (Doc. #29) is hereby **denied**;

(2) A **Telephonic Status Conference** is hereby scheduled in this matter for **October 27, 2005 at 10:30 a .m.**, at which time the Court will set a trial date. The Court will initiate the call; and,

(3) Pursuant to the Court's prior Orders (Docs. # 22 & #31), the time period from April 21, 2005, through the date of this Order, totaling 183 days, is deemed **excludable time** pursuant to 18 U.S.C. § 3161(h)(1)(F).

This 21st day of October, 2005.



Signed By:
David L. Bunning
United States District Judge

G:\DATA\Opinions\2-04-70-CaldwellMotiontoSuppress.wpd